IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

WANDA ELIZABETH PIZARRO MERCED

Debtor

CASE NO. 18-03837 (MCF)

CHAPTER 7

## **OPINION AND ORDER**

The Debtor, Wanda Elizabeth Pizarro Merced ("Debtor"), filed a voluntary petition under chapter 7 of the Bankruptcy Code. The United States Trustee ("UST") moved to dismiss the petition for abuse and bad faith, pursuant to 11 U.S.C. § 707(b)(1) & (b)(3).[1] The Debtor opposed the motion. An evidentiary hearing was conducted on the contested matter and this decision constitutes our findings of fact and conclusions of law.[2]

After careful consideration of the testimony, the exhibits, and the argument of the parties, we find that the UST established that the petition was filed in bad faith and that the totality of the circumstances of the Debtor's financial situation demonstrates abuse. Rather than dismissing the chapter 7 case forthwith, the Debtor will be afforded the opportunity to convert her case to chapter 13 by filing a notice of conversion and a proposed chapter 13 plan within thirty (30) days from the entry of this ruling. If the Debtor chooses not to convert to chapter 13 then the UST's motion will be granted, and the case will be dismissed without further notice or hearing.

---

[1] The terms "Bankruptcy Code," "chapter," "section" and "§" refer to Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA"), unless otherwise indicated.

[2] Each finding of fact may be considered a conclusion of law, if necessary and each conclusion of law may be considered a finding of fact.

## I. JURISDICTION

The Court has jurisdiction over the contested matter under 28 U.S.C. §§ 1334 & 157 and L.Cv.R. 83K(a). This is a core proceeding, pursuant to 28 U.S.C. § 157(b).

## II. FINDINGS OF FACTS

The parties agreed to admitted facts in their Joint Pretrial Report.[3] Those facts are incorporated herein.[4] The following exhibits were admitted into evidence: Joint Exhibits I, II, III, IV, V, VI, VII, VIII and Exhibits B, C, D, and 5.[5]

At the evidentiary hearing, the UST presented its witness, Mr. Emilio Miranda, a bankruptcy analyst in the office of the UST for over ten years.[6] He is an attorney and certified public accountant.[7] His duties are to conduct financial analysis for the bankruptcy cases. As part of his duties for chapter 7 cases, he reviews the cases for compliance with the Bankruptcy Code and 11 U.S.C. § 707. He indicated that he reviewed the Debtor's schedules, statement of financial affairs, bank statements, attended the creditors' meeting, asked questions to the Debtor, and performed an analysis for the case.

The UST's analyst prepared a summary of the prepetition loans taken by the Debtor prior to and after Hurricane Maria.[8] According to the summary, prior to Hurricane Maria, the Debtor had loans with Coop Los Hermanos ($30,000), COOPACA ($49,876.82) and AEELA-1

---

[3] Docket No. 66 at 2-12.

[4] At the end of Paragraph 34 of the Admitted Facts in the Joint Pretrial Report, it states "[Counsel for Debtor stated they need to verify this allegation]." Docket No. 66 at 6. It is unclear whether Paragraph 34 was confirmed by the Debtor's counsel. Nevertheless, the Debtor testified in general terms that she used the loan proceeds of AEELA-2 for making car repairs, back-to-school expenses for her daughter, and family medical expenses.

[5] Joint Exhibits II, III, V, VI, VII, and the promissory note of Joint Exhibit I needed to be translated into English. Docket No. 81. After affording the UST an opportunity to translate the documents, the Debtor questioned whether the translator complied with the requirements of the L.Cv. R. 5(g). Docket Nos. 88 & 91. The UST was granted a period to substantiate the qualifications of the translator. The UST filed the certification of the translator and requested that these exhibits be admitted into evidence. Docket No. 93. No objections were filed as to the certification of the translator, the Joint Exhibits II, III, V, VI, VII and the promissory note of Joint Exhibit I are admitted into evidence. Joint Exhibits I, IV and VII, UST's Exhibits B, C, and D and Debtor's Exhibit 5 were admitted. Docket Nos. 81 & 91.

[6] The UST waived its right to an opening statement.

[7] The audio files of the hearings are available on the Court's Docket at Docket Nos. 82 & 90. The UST requested that Mr. Miranda's testimony be admitted as a lay witness, not as accounting expert. Debtor had no objection.

[8] Exhibit D: Table of Loans Taken by the Debtor.

($15,050), for a total of $94,926.82.  After Hurricane Maria, the Debtor had loans with the Small Business Administration ("SBA") ($25,000), AEELA-2 ($16,733.69), Coop Los Hermanos-2 ($30,000) and Sistema de Retiro, a retirement plan from the University of Puerto Rico ($31,550), for a total of $103,283.69.  The summary does not include the Debtor's credit card debts.[9]

After his summary was prepared in Exhibit D, the UST's analyst discovered that the Debtor had another loan with "Sistema de Retiro" from the University of Puerto Rico, which was taken by the Debtor prior to Hurricane Maria.[10]  The Debtor's total indebtedness prior to Hurricane Maria, was approximately $121,000, when adding the amounts on Exhibit D ($94,926.82) and the Sistema de Retiro Loan ($26,000 approx.).

We note that in item number 10 of the SBA loan application, the Debtor disclosed $112,650 total indebtedness, which includes Debtor's loans with Coop Los Hermanos, COOPACA, Sistema de Retiro University of Puerto Rico and credit card debts with Master Card, Discover, and Visa.[11] The UST analyst informed that the Debtor did not disclose on her SBA application that she had an AEELA-1 loan for about $15,050.  Thus, according to our calculation, the Debtor's total indebtedness before Hurricane Maria is $127,700 including loans and credit cards.[12]  The Debtor disclosed $41,643 in yearly income in her SBA loan application.[13]

With the SBA loan ($25,000), the Debtor paid off her existing personal loan with AEELA-1 in the amount of $16,801.93 on January 26, 2018.[14]  The remaining amount was used for purchases of personal property.  After paying off the AEELA-1 loan, the Debtor incurred in another AEELA loan for $16,733.69 on March 13, 2018 ("AEELA-2").

The Debtor continued to borrow. On April 23, 2018, the Debtor renewed a loan with Cooperativa Los Hermanos-2 that was for $30,000. Of that amount, she received $2,553.60. On June 16, 2018, the Debtor renewed a loan with Sistema de Retiro that was for $31,550, but only

---

[9]  Id.

[10]  The UST's analyst made the discovery when he reviewed the SBA loan documents.  The Debtor's SBA application listed her personal loans. Joint Exhibit IV at 2.

[11]  Id.

[12]  There are disparities regarding Debtor's total indebtedness due to the different amounts reported by Debtor.  We do not have to find the exact amount of her indebtedness prior to Hurricane Maria to resolve the ultimate issue in this case.

[13]  Joint Exhibit IV at 1 (item number 5).  This amount does not include her companion's contribution to the household of $1,250.00 reported in Schedule I.  Joint Exhibit VII at 47.

[14]  Joint Exhibit VII at 16.

received $7,291.52.  She was required to make monthly payments of $649.21.[15]   According to the testimony of the UST's analyst, if the Debtor had not taken this retirement loan, the extra $649.21 could have been used to pay 32% of the $120,000 unsecured debt listed in the schedules in a five-year plan, if the Debtor had filed a chapter 13 case.

The Debtor incurred approximately $12,000 in credit card debts after Hurricane Maria, as reflected in Schedule E/F.[16] Adding the credit card debts ($12,000) with the personal loans listed in Exhibit D ($103,283), the total is $116,000 approximately.

The Debtor's sources of income are government salary, domestic support obligation ("DSO") payment and live-in companion's household contribution, for a total net monthly income of $3,684.22.[17] Her present monthly income is now lower due to reduced domestic support obligation payment and lost overtime pay of approximately $400-$500 monthly. The Debtor's budget clearly indicates that she does not have enough income to make all her monthly payments on her loans.

The Debtor testified on her behalf and recounted that Hurricane Maria occurred in September 2017. The night before the hurricane made landfall, she went to bed between 8:30 p.m. and 9:00 p.m. Fifteen minutes after going to rest, her partner woke her up to inform her that the house was flooding. They awoke the children and exited the house to the flooded street and had to walk toward an ambulance because their vehicle was not working due to the flooding. The ambulance took them to the nearest shelter, where they stayed overnight, and returned to their home the following morning at 6:00 a.m. to inspect the damages.  When they arrived at the house, they found their belongings ruined by the flood waters. The living room sets, the washer and dryer, the computer, clothing, shoes, purses and appliances were damaged.

The Debtor had lived for four years in a rented house in Levittown. The flood waters reached about four feet inside her home. The Debtor, her partner, her son and daughter moved in with her in-laws from September 2017 to March 2018.

---

[15]  Exhibit D.

[16]  Joint Exhibit VIII.  This amount excludes the Pentagon Federal credit card debt.

[17]  Schedule I, Joint Exhibit VIII at 36.

The Debtor applied for assistance from the Federal Emergency Management Agency ("FEMA") on the agency's internet webpage. When she submitted her application, she received a message that informed her that she did not qualify for assistance. Upon denial of her application, FEMA referred her to the SBA. She personally visited the SBA's offices to fill out a loan application. She explained that she had lost all her personal belongings in her rented house. She needed to re-do her life with her family. She wanted to start over with her family. The Debtor and her family had plans to buy a house rather than renting a place. She has never owned a home.

Under the terms of the SBA $25,000 loan agreement, the Debtor was obligated to use all the loan proceeds to repair or replace disaster damaged personal property or motor vehicle.[18] Of the $25,000, she paid off AEELA-1 loan approximately $16,000 to have a financial breather. The Debtor said she paid about $431 a month to AEELA-1 loan. She would be required to pay about $95 a month for the SBA loan. The Debtor used the remaining part of the SBA loan proceeds to refurbish and equip a household where she was going to live.

The Debtor moved to a rented three-bedroom house with two bathrooms, where she currently lives. She uses her maternal aunt's vehicle for transportation because her car never started after the hurricane. The Debtor said she spent about little over $25,000 for household goods and furnishings. She spent $15,000 in purchasing items such as three-bedroom sets, dining room set, living room set, sofa bed, bedding, washer/dryer, microwave, oven, recliner, television, TV furnishings, appliances and equipment for the house as well as clothing, shoes. She explained that she purchased quality bedroom furniture because her prior sets were made of compressed cardboard which were damaged in the flood. If another catastrophe or flood was to happen, she hopes that the new furniture would resist.

On cross-examination, she admitted that her Amazon purchases amounted to about $4,350 from May 2017 to June 2018. She had originally purchased during that period $6,000 worth of items; but she had returned items amounting to $1,650. The UST tried to point out that the total of Amazon purchases ($4,350) and the household items previously mentioned ($15,000) would be about $19,350. The Court notes that these amounts are inaccurate to reflect the purchases made

---

[18] Joint Exhibit IV.

after Hurricane Maria because it includes Amazon purchases made by the Debtor prior to the Hurricane Maria from May 2017 to September 2017.

The Debtor testified that the $25,000 received from the SBA was insufficient to replace all that she lost, including the vehicle in the hurricane. If that was the case, the UST inquired on cross-examination why did she originally report in her schedules that the value of her personal property was $4,850. The Debtor explained that those items depreciated once she purchased them. Her mechanic certified that to repair the vehicle that was damaged in Hurricane Maria would cost $8,000; but it was not worth repairing because there could be hidden and latent damages that could be more expensive.

The Debtor explained that she paid off AEELA-1 loan in January 2018 because she wanted to remove that monthly payment from her pay stub so that she could qualify for a home mortgage. When she could not purchase a house because she did not qualify, she took out the AEELA-2 loan in March 2018. She justified taking the loans and the renewals from April to June 2018 because she had to make car repairs, purchase back-to-school materials for her daughter, and pay family medical expenses (laboratory exams and studies, eye exams for the Debtor and her children).[19] In total, all the new loans and renewals that the Debtor took after Hurricane Maria was $51,578. Two months before the bankruptcy, the Debtor spent $17,000 because she had to buy things for the house. Soon after, the Debtor filed for bankruptcy on July 5, 2018.

In April 2018, the Debtor stopped receiving her $643 monthly DSO payments. Around October or November 2018, after the petition date, the Debtor received notice from the local court that her DSO was reduced to the monthly amount of $408. The arrears for DSO were paid retroactively. She is currently receiving DSO. Her overtime time stopped for a period of four months. She used to receive between $400 to $500 a month when she worked overtime.

## III. PARTIES' ARGUMENT

The UST's request for dismissal is based on two arguments: (1) the Debtor spent and borrowed excessive amounts in the months leading up to the petition, when she knew or should have known she would be unable to repay the amounts borrowed; and (2) the Debtor may repay a portion of her debts if one were to add the amounts she pays for a retirement fund loan to her

---

[19] See n.3.

-6-

disposable income. The UST argues that the Debtor was familiar with the bankruptcy process and obtaining a discharge because she obtained a chapter 7 discharge eight years earlier. The Debtor admitted that she spent all the SBA loan ($25,000) proceeds. She claims that she spent over $25,000 to recover her household goods and belongings. Nevertheless, in the original Schedule A/B, the Debtor reported that her personal and household goods were valued at $4,850. Hence, she misrepresented information on her schedules because these items were recently purchased before her bankruptcy case. She used the SBA loan contrary to the terms of the agreement because she used $16,000 to pay off an AEELA loan and then took out another loan with AEELA ($16,000) which required a monthly payment of $431. The first monthly payment due under the SBA loan was to occur after the filing of the bankruptcy case. She never even attempted to repay that loan. Prior to the hurricane, she could not pay her obligations. After the hurricane, she continued to borrow money and she exceeded her ability to pay those debts.

The Debtor refutes the UST's allegations and contends that the causes of her chapter 7 petition are: (a) unexpected property loss and homelessness due to a catastrophe, and (b) unexpected disruption and decrease of income. The Debtor alleges that the UST has not shown that the Debtor to be less than candid with creditors or with this Court or that she behaved in an egregious manner or sustains any semblance of life-style greater than that of a mid-level Commonwealth government employee. The Debtor contends that the retirement loan complies with the intent of Congress. Even if the Debtor were ordered not to pay the retirement loan, the effect would be moot inasmuch as the Debtor is entitled by law to amend Schedule J to increase expenses, pursuant to Internal Revenue Service caps, leaving no disposable income to fund a chapter 13 plan. In re Miranda, Case No. 10-00641 (ESL), Opinion and Order of March 9, 2011, Docket No. 54.

## IV. CONCLUSIONS OF LAW

The UST bears the burden of establishing by preponderance of the evidence that the Debtor's petition under chapter 7 constitutes an abuse. The UST must prove that: 1) the Debtor filed her petition in bad faith or 2) that the totality of the circumstances of the Debtor's financial

situation shows abuse.  11 U.S.C.  § 707(b)(1)[20] & (b)(3);[21] In re Nadeau, 520 B.R. 380, 385 (Bankr. D.R.I. 2014).

## A.  BAD FAITH

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor."  Marrama v. Citizen Bank of Mass., 549 US 365, 367 (2007).  A discharge allows a debtor to start a new financial life.  A debtor engaged in bad faith filing of the petition will not be granted discharge.  A bad faith filing is a voluntary petition "that is inconsistent with the purposes of the Bankruptcy Code or an abuse of the bankruptcy system." Black's Law Dictionary 166 (10th ed. 2014); In re Webb, 447 B.R. 821, 824 (Bankr. N.D. Ohio 2010).

In deciding whether a chapter 7 petition was filed in bad faith, courts have taken several factors into account, including:

> (1)  the debtor's history of filings and dismissals;
>
> (2)  whether the debtor misrepresented fact(s) in the petition, unfairly manipulated the bankruptcy code, or otherwise filed the petition in an inequitable manner;
>
> (3)  whether the debtor needs bankruptcy protection;
>
> (4)  whether the debtor intended to invoke the automatic stay for an improper purpose, such as solely to defeat a state court litigation;
>
> (5)  whether egregious behavior is present.

---

[20] Section 707(b)(1) states that:
> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee …., or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1).

[21] Section 707(b)(3) provides that:
> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

(6) whether there were eve-of-bankruptcy purchases;

(7) whether the chapter 7 filing was due to unforeseen or catastrophic events;

(8) whether an unscrupulous debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors through an unprincipled accumulation of consumer debt; and

(9) whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding her ability to repay them.

In re Mitchell, 357 B.R. 142, 153-155 (Bankr. C.D. Cal. 2006)(listed the first six factors and the last factor); In re Motaharnia, 215 B.R. 63, 71 (Bankr. C.D. Cal. 1997)(added the seventh and eight factors). See also In re Uddin, 196 B.R. 18, 22 & 24 (Bankr. S.D.N.Y. 1996) (holding that debtor had engaged in "blatant abuse of consumer credit" and that dismissal is warranted if the "financial distress is directly related to purchases of luxury goods and accrual of gambling debts.").

"Furthermore, no single criterion should be considered dispositive, but rather the entirety of the situation must be evaluated." Mitchell, 357 B.R. at 154. The determination of abuse is made on a case-by-case basis after a comprehensive review of the facts presented by the specific case. See, e.g., In re Hageney, 422 B.R. 254, 259 (Bankr. E.D. Wash. 2009) (holding that a debtor's selection of the date to commence the case was not an indicia of bad faith; but that the purchase of unnecessary luxury ten weeks prior to bankruptcy at a time when monthly obligations were not being met, was conduct which gave rise to a finding of bad faith.). Neither malice nor fraudulent intent by a debtor is required for finding bad faith. Mitchel, 357 B.R. at 155.

In applying these factors to this case, even though we are sympathetic to the dire situation faced by the Debtor related to Hurricane Maria, the Court finds that the petition was filed in bad faith. The timing of the Debtor's petition is the most telling evidence of bad faith and abuse. The Debtor filed two bankruptcy cases. The first was a chapter 7 case where the Debtor received a discharge. Eight years later, the Debtor refiles another chapter 7 case. Once a debtor receives a chapter 7 discharge, the debtor is not allowed to obtain another discharge for eight years. 11 U.S.C. § 727(a)(8). The Debtor sought her second discharge after the eight-year waiting period had expired to file another chapter 7 case, even without attempting to make the first payment on her loan from the SBA. From her demeanor during testimony, the Court noticed that she did not feel the gravity of taking out the multitude of loans which she could not repay. She appeared to diminish the importance of taking out loans by stating that they were just "renewals," as if renewals were less serious. It seems quite apparent to the Court that repaying the loans was not a major concern,

given that clearly, she could not afford the monies necessary to make the monthly payments, even before the tragic events of Hurricane Maria unfolded for the citizens of Puerto Rico.

Another tell-tale sign is that the Debtor made consumer purchases through loans and credit cards three to four months before the bankruptcy filing. The Debtor said she had to make those purchases due to the damages to personal property she sustained in Hurricane Maria. The horror and ordeal that the Debtor and her family faced as a result of Hurricane Maria is undisputed.

After living with her partner's family for six months after the hurricane, in April 2018, the Debtor and her family moved out.  The Debtor rented a three-bedroom house and her aunt provided her with a car.  From April 2018 to June 2018, the Debtor began making consumer purchases of furniture, appliances, television set, electronic equipment, a PlayStation, and clothing, in order to furnish her newly rented place. These purchases happened about three months before the bankruptcy due to the fact she moved out of her partner's family's house. She made these purchases using borrowed money from loan and credit cards without consideration that she would have to make monthly payments. She never mentioned that she made a budget to determine whether she could pay for these items after they were purchased.  Unfortunately, the Debtor went on a reckless or misinformed borrowing spree that she would be unable to pay back and then filed for bankruptcy.

The UST points out that certain purchases were unnecessary or extravagant such as a Samsung TV, a touch computer, a laptop and a PlayStation. The Court does not view these items she purchased as wrong; it is the timing of the filing of the petition and her inability to pay the items she purchased through loans and credit cards that are objectionable. This family lost everything and moving into a new place would generally require such purchases as well as furniture, appliances, etc.[22] Although the Debtor needed to replace all that she lost, she did not have to make all the purchases in a span of three to four months and then file for bankruptcy. She could have saved money while she was living with her relatives and she could have replaced the

---

[22] The UST points out the type and size of the television purchased by the Debtor and that she purchased a PlayStation.  The Debtor bought one family television and did not purchase a television for every bedroom. This family lost computers and games.  Having one gaming device for enjoyment of a family that survived a category four storm that bordered on a category 5 was not ill-willed.  She had to furnish a new home for her family.

damaged items over time. The Debtor filed for bankruptcy soon after she fully furnished her new home and purchased personal belongings.

The Court cannot condone the Debtor's egregious conduct of misusing the loan proceeds granted by the SBA in November 2017. Two months after the hurricane, she filled out a Disaster Home Loan Application with the SBA, after she was denied FEMA assistance. The SBA granted her loan for two specific purposes. According to loan documents, she was allotted approximately $21,200.00 to replace or repair disaster damaged personal property (excluding motor vehicles) in similar kind and quantity and approximately $3,800 to replace or repair disaster damaged motor vehicle.[23] She did not replace the vehicle and instead her aunt provided her with a vehicle. She could not repair the vehicle damaged by the disaster, per the mechanic's recommendation because there could be hidden and latent damages.

In addition to not using the $3,800 for replacing the vehicle, the Debtor used over half of the loan proceeds, approximately $16,000 out of $25,000 to pay off a pre-existing loan. Having paid off AEELA-1, on March 13, 2018, four months before the bankruptcy, the Debtor obtained another loan with AEELA-2 for a higher amount --$16,733.69. Although the Debtor testified that the replacement of damaged personal property was over $25,000, she never established the exact amount she needed or the actual amount she spent to replace the personal items.

The monies she borrowed from the SBA were not intended to pay off debt or consolidate debts; they were for disaster relief. Although the Court believes the Debtor when she testified that it cost more than $25,000 to fully equip a three-bedroom house, she did not disclose the true purpose of how she was going to use the loan proceeds to pay off another debt with the SBA loan proceeds. The SBA loan was for disaster replacement and repairs. Nor did she disclose the AEELA-1 loan in her loan application and that is precisely the loan she paid off with the loan proceeds. The Debtor said she told the SBA that she lost everything, and that she could not move back to her rented house. The purpose of the loan was for specific purposes of disaster relief and the Debtor took it upon herself to ignore the terms and conditions of the SBA loan.[24] Although the Debtor may have had good intentions in trying to buy her family their first home, the Debtor

---

[23] Joint Exhibit IV at 13.

[24] The Debtor's counsel described the Debtor has a victim in his opening and closing remarks. The Court does not view the Debtor or anyone who lived through "Maria" or any catastrophic event a victim but a survivor.

-11-

dismissed the conditions that the creditor placed on her borrowing the monies.  The Court cannot overlook the Debtor's deliberate disregard to adhere to the terms of the SBA loan.

Another indication of her motive is the timing of her bankruptcy in relation to her first payment under the SBA loan. Her first payment under the SBA loan was due on November 14, 2018, a year after she received the loan proceeds. She never attempted to make the first payment under the SBA loan. She instead filed for bankruptcy on July 5, 2018.  Since the SBA loan is unsecured and she is under bankruptcy protection, the SBA will never collect it.  Her previous filing of a chapter 7 bankruptcy is enough for her to know that under this legal protection she can discharge her unsecured obligations.  Thus, the Debtor never intended to pay the SBA loan.

The Debtor's reckless conduct continued when the she did not qualify for a home mortgage. The Debtor kept borrowing money and renewing prior loan obligations. Prior to Hurricane Maria, the Debtor had four loans with COOP Los Hermanos, COOPACA, AEELA-1 and Sistema de Retiro. She had initially reduced her indebtedness to three loans because she had paid off AEELA-1 with the SBA proceeds. Once again, she borrowed from AEELA-2 and renewed other loans. Therefore, the UST established that the Debtor filed her chapter 7 petition in bad faith.

## B.  TOTALITY OF THE CIRCUMSTANCES TEST

In the alternative, the UST has also met the burden of showing abuse under the totality of circumstances of the Debtor's financial situation. The factors to be considered under the totality of the circumstances test are the following:

(1)   Whether the Debtor is seeking an advantage over his creditors;

(2)   Whether the Debtor enjoys a stable source of future income;

(3)   Whether the Debtor is eligible for chapter 13;

(4)   Whether there are state remedies with the potential to ease the Debtor's financial predicament;

(5)   The degree of relief obtainable through private negotiation; and

(6)   Whether the Debtor's expenses can be reduced significantly without deprivation of adequate food, clothing, shelter and other necessities.

-12-

First USA v. Lamanna (In re Lamanna), 153 F.3d 1, 4 (1st Cir. 1998)("a comprehensive review of the debtors current and potential financial situation").[25]

In applying the total circumstances test to this case, the Debtor enjoys a stable source of future income. She has been working for the past 16 years for the local government. Although her DSO payments were reduced, she testified that those payments were current. She is eligible for chapter 13 because she is an individual with regular income.

The Debtor is seeking an advantage over her unsecured creditors, especially the SBA. The Court explained previously the Debtor's bad faith action when she borrowed monies from the SBA.[26] If Debtor obtains a chapter 7 discharge, all the unsecured debts will be discharged. The Debtor's first installment payment for the SBA loan was due after the filing of the petition. She received approximately $26,500 from three loans, whether new or renewed in 114 days before filing her petition.[27] She had already borrowed $25,000 from the SBA. She did not pay her creditors with any of these moneys except for AEELA-1. Then she borrowed from it again.

The Debtor testified that the loans taken after Hurricane Maria were renewals, which is not quite accurate. Two of the post-Maria loans were renewals and one was brand new. Nevertheless, she did not have to take additional monies from Coop Los Hermanos or Sistema de Retiro, nor did she have to take a new loan with AEELA when she had paid it off with the SBA loan proceeds. She decided to do so in order to reestablish herself and her family at the expense of her creditors. The Debtor took an unfair advantage of her unsecured creditors.

The timing of her bankruptcy in relation to her indebtedness is informative, as illustrated by the UST's Exhibit D. Approximately three months before the bankruptcy, on March 13, 2018, the Debtor borrowed again from AEELA. She borrowed $16,733.69 requiring her to pay $431.02 monthly (AEELA-2). A month later, in April 23, 2018, the Debtor renewed her loan with COOP Los Hermanos for the same amount of the original debt of $30,000 but received $2,533.60 in loan proceeds. Now she was required to pay $430 when she was originally paying $381. This debt is

---

[25] Although the Lamanna case is a pre-BAPCPA, the factors adopted by the First Circuit remains relevant to post-BAPCPA. In re Boule, 415 B.R. 1, 5 (Bankr. D. Mass. 2009) (explains the applicability of Lamanna).

[26] Much of the discussion in the Bad Faith Section in this Opinion and Order regarding the details of her loans and credit card purchases apply here. For expediency sake, the Court will not repeat that discussion.

[27] Exhibit D ($16,733.69 from AEELA-2; $2,553.60 from COOP Los Hermanos-2; $7,291.52 from Sistema de Retiro).

partly unsecured. A month and a half later, on June 1, 2018, she renewed her retirement loan with the Sistema de Retiro for $31,550.00 but received $7,291.52 in loan proceeds. This last loan was incurred a month before the bankruptcy case.

Along with borrowing a few months before the bankruptcy, the Debtor used her credit cards too. In April 2018, she borrowed from three different credit cards: Pentagon Federal Credit Union, JCPenney and Discover. On her Pentagon Federal Credit Union credit card, she borrowed $2,484.90. On her JCPenney credit card, she incurred $2,697.29 and on her Discover Card, she incurred in $5,970.57.[28] These credit card debts can be discharged in a chapter 7 case. The Debtor knew how chapter 7 discharge operates because she had previously filed bankruptcy under this chapter. She took an unfair advantage of her creditors by accumulating consumer debt. Not only did she furnish her household and buy personal belongings with credit cards and loans, she has a furniture lease with Acceptance Now in the amount of $1,843.23 which was incurred in March 2018, a few months before the bankruptcy filing.

The Debtor admitted that she exceeded her ability to repay her creditors and that is why she filed for bankruptcy. Although the Debtor had to replace all that was lost, it was not prudent to make all those purchases by borrowing money and charging up her credit cards in a short period; then file for bankruptcy in order to discharge those debts. Thus, the UST has established that the totality of the circumstances of her financial situation demonstrates abuse.

Based on the foregoing, the UST established that the Debtor's petition was filed in bad faith and that her financial situation demonstrates abuse, pursuant to 11 U.S.C. § 707(b)(3)(A)-(B). Notwithstanding the request that the case should be dismissed, the Court will afford the Debtor the opportunity to avoid dismissal of her case provided she files a notice of conversion of

---

[28] Joint Exhibit VIII.

-14-

this case to chapter 13 and files a proposed chapter 13 plan within 30 days of the date of this Opinion and Order. If the Debtor chooses not to convert to chapter 13 then the UST's motion to dismiss shall be granted and the case will be dismissed without further notice or hearing.

   **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of April, 2020.

*Mildred Cabán*
MILDRED CABAN FLORES
United States Bankruptcy Judge

-15-